IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| JOSEPH SMITH, | § § § | |
| *PLAINTIFF*, | § | |
| v. | § § | CASE NO. 14-cv-00666-JRG |
| ORBCOMM, INC., and STARTRAK INFORMATION TECHNOLOGIES, LLC | § § § | |
| | § | JURY TRIAL REQUESTED |
| *DEFENDANTS*. | § § | |

# **PLAINTIFF JOSEPH SMITH'S OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... iii

I.     THE SMITH INVENTION AND THE '686 PATENT ............................................1

II.    LEGAL STANDARD................................................................................................2

III.   RELATED CASE AND PROCEDURAL HISTORY .............................................5

IV.    UNCONTESTED TERMS .......................................................................................7

V.     PLAINTIFF'S PROPOSED CLAIM CONSTRUCTION
       FOR DISPUTED TERM IN THE '686 PATENT: "outputs…operable to be
       controlled / outputs to be controlled ['686 patent claims 15, 29 and 48] ...............8

VI.    CONCLUSION..........................................................................................................14

CERTIFICATE OF SERVICE ................................................................................................15

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
　632 F.3d 1246 (Fed. Cir. 2011) .................................................................................... 3

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
　256 F.3d 1323 (Fed. Cir. 2001) .................................................................................... 4

*Markman v. Westview Instruments*,
　52 F.3d 967 (Fed. Cir. 1995) .................................................................................... 3, 4

*Phillips . AWH Corp.*,
　415 F.3d 1303 (Fed. Cir. 2005 ) ............................................................................ 2, 3, 4

*Scimed Life Sys., Inc. v. Advanced Cardiovascular Systems, Inc.*,
　242 F.3d 1337 (Fed. Cir. 2001 ) .................................................................................... 3

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
　299 F.3d 1313 (Fed. Cir. 2002 ) ................................................................................ 2, 4

*Vitronics Corp. v. Conceptronic, Inc.*,
　90 F.3d 1576 (Fed. Cir. 1996 ) .............................................................................. 2, 3, 4

*White v. Dunbar*,
　119 U.S. 47 (1886) ........................................................................................................ 3

Pursuant to the Court's Docket Control Order (Dkt. #19) and Local Patent Rule 4-5(a), Plaintiff Joseph Smith ("Smith" or "Plaintiff") submits this Opening Claim Construction Brief in support of his proposed claim construction of the one claim term at issue.

## I.   THE SMITH INVENTION AND THE '686 PATENT

On August 26, 2003, United States Patent No. 6,611,686, entitled "Tracking Control and Logistics System and Method" (the "686 patent") ("Exhibit B"), was issued by the United States Patent and Trademark Office ("USPTO").  Smith is an inventor and the sole owner of the '686 Patent.  The '686 patent was subsequently put into reexamination.[1]  Following reexamination of the '686 Patent, the USPTO issued an *Ex Parte* Reexamination Certificate, Number US 6,611,686 C1 ("Exhibit A").

The Smith invention is a system for tracking and monitoring virtually any asset, including for example, trucks, cargo containers, railcars, and even bicycles.  The invention was designed to be versatile, scalable, and easily configurable.  The system works in the following way: equipment (communication/monitoring unit) is placed on the asset to be tracked.  The monitoring unit has wireless communication capability along with various other types of functionality, which is discussed in detail in the '686 patent.  This monitoring unit communicates wirelessly usually via the cellular network or through satellite networks to a server and database where the information is managed.  The system user may then access and manipulate this information over the Internet from a personal computer.

---

[1] On May 27, 2008, a third party requested an *Ex Parte* Reexamination of the '686 Patent, and the reexamination proceeding was assigned Control No. 90/009,121 ("the '121 proceeding").  On September 3, 2009, a third party requested a second *Ex Parte* Reexamination of the '686 Patent, and the reexamination proceeding was assigned Control No. 90/010,601 ("the '601 proceeding").  The United States Patent and Trademark Office merged the '121 proceeding and the '601 proceeding on May 25, 2010.  Upon completion of the reexamination proceedings, the USPTO issued an Ex Parte Reexamination Certificate on March 15, 2011. (Exhibit A).

1

With the Smith invention, multiple users can efficiently track and monitor assets. For example, a freight hauler could track and monitor its entire fleet of trucks from a personal computer. If desired, a shipping company could track a single intermodal container from ship to train to truck and from departure to delivery. The asset monitoring system can be customized to monitor, manage, and control virtually any type of information that can be carried by a signal. As examples, the user could track location, container temperature, tire pressure, and an almost limitless list of other variables. The user can control the programming that manages and manipulates this information, and the user can direct processes at or near the target, such as activating a warning light, turning the GPS on and off to manage battery life or locking the door.

## II.     LEGAL STANDARD

Claim terms are generally given their "ordinary and customary meaning" in the context of the entire patent as understood by one of ordinary skill in the relevant art at the time of the invention (i.e., the effective filing date of the patent application). *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In cases where the claim terms are clear and would not be confusing to a jury, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.

Although "the claim construction inquiry . . . begins and ends in all cases with the actual words of the claim," courts have looked for additional guidance in the intrinsic evidence of record, including the written description, the drawings, and prosecution history." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002 ) (internal quotes marks omitted). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in

the context of the particular claim in which the disputed terms appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.

But regardless of its utility and reliability in claim construction, there is an important distinction that must be recognized when referring to the patent specification: the specification is to be used to interpret the meaning of a claim, not to confine patent claims to the specific embodiments of the invention. The specification should be used "for the purpose of better understanding the meaning of the claim . . . not for the purpose of changing it, and making it different from what it is." *White v. Dunbar*, 119 U.S. 47, 51-52 (1886). The invention should always be limited by the claims, not by the specification. *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1256 (Fed. Cir. 2011).

Even though the claims are the primary focus in defining the scope of the patent, the written description, or specification, can provide clarity. *Scimed Life Sys., Inc. v. Advanced Cardiovascular Systems, Inc.,* 242 F.3d 1337, 1344 (Fed. Cir. 2001). The claims "must be read in view of the specification of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc). The specification is "highly relevant to the claim construction analysis" and can be the "single best guide to the meaning of a disputed term." *See Vitronics Corp.*, 90 F.3d at 1582.

The patent prosecution history, or file history, is also considered intrinsic evidence and may be considered if offered to the court. *Phillips*, 415 F.3d at 1317. The prosecution history includes the record of all communication with and proceedings before the USPTO, as well as the prior art cited during patent examination. *Id.* The prosecution history can often be informative by illustrating how the inventor understood the invention during prosecution and by indicating whether the inventor disclaimed any particular interpretation during such time. *Id.* Even so,

3

*Phillips* instructs that, because the prosecution history is the product of ongoing negotiations between the inventor and the USPTO, it can often "lack [ ] the clarity of the specification and is thus less useful [in] claim construction." *Id.*

The Federal Circuit also permits district courts to consider extrinsic evidence in claim construction, albeit to a lesser degree of reliance. *Phillips*, 415 F.3d at 1317. The Federal Circuit instructs that intrinsic evidence alone is sufficient to resolve ambiguity in disputed claim terms in most instances and, in such a case, reliance on extrinsic evidence is improper. *See Vitronics Corp.,* 90 F.3d at 1583.

Extrinsic evidence, including expert testimony, inventor testimony, dictionaries, and technical writings, is only relevant for the explanation of patent claims that remain unclear after thorough analysis of the intrinsic evidence. *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001). "Extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319. The court may turn to dictionaries, especially technical dictionaries, and treatises if the court "deems it helpful in determining 'the true meaning of language used in the patent claims.'" *Id. (quoting Markman*, 52 F.3d at 980. *Phillips* instructs that the court must use these sources appropriately, keeping in mind the important role of intrinsic evidence in claim construction. *Id.* at 1321-22 ("[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.").

*Phillips* instructs that, because the prosecution history is the product of ongoing negotiations between the inventor and the USPTO, it can often "lack [ ] the clarity of the specification and is thus less useful [in] claim construction." *Id.*

The Federal Circuit also permits district courts to consider extrinsic evidence in claim construction, albeit to a lesser degree of reliance. *Phillips*, 415 F.3d at 1317. The Federal Circuit instructs that intrinsic evidence alone is sufficient to resolve ambiguity in disputed claim terms in most instances and, in such a case, reliance on extrinsic evidence is improper. *See Vitronics Corp.,* 90 F.3d at 1583.

Extrinsic evidence, including expert testimony, inventor testimony, dictionaries, and technical writings, is only relevant for the explanation of patent claims that remain unclear after thorough analysis of the intrinsic evidence. *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001). "Extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319. The court may turn to dictionaries, especially technical dictionaries, and treatises if the court "deems it helpful in determining 'the true meaning of language used in the patent claims.'" *Id. (quoting Markman*, 52 F.3d at 980. *Phillips* instructs that the court must use these sources appropriately, keeping in mind the important role of intrinsic evidence in claim construction. *Id.* at 1321-22 ("[H]eavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.").

### III. RELATED CASE AND PROCEDURAL HISTORY

On June 6, 2014, Plaintiff Smith filed this case against ORBCOMM, Inc. and StarTrak Information Technologies, LLC (colletively "ORBCOMM Defendants" or "Defendants") for infringement of '686 patent (Dkt. #1), and Smith filed a second case against Honeywell on the same date. *See* Case No. 2:14-cv-00665-JRG, *Joseph Smith v. Honeywell lnternational, Inc.*, in the United States District Court for the Eastern District of Texas, Marshall Division. Smith sued SkyBitz for infringement of the '686 patent on July 14, 2014. *See* Case No. 2:14-cv-00772-JRG, *Joseph Smith v. SkyBitz, Inc.*, in the United States District Court for the Eastern District of Texas, Marshall Division. The Court consolidated the *Honeywell* and *SkyBitz* cases by order dated Octrber 13, 2014 (*Honeywell* Dkt. #5), and issued a scheduling order for the consolidated case (*Honeywell* Dkt. #19). The ORBCOMM case received its own scheduling order, trailing the consolidated *Honeywell/SkyBitz* case by approximately two months (Dkt. #19).

In the consolidated *Honeywell/SkyBitz* case, a *Markman* hearing was conducted June 5, 2015. Pursant to the schedule in that case, the defendants identfed the claim terms for which they sought construction by the Court. Prior to the *Markman* hearing, Plaintiff Smith settled with Honeywell, leaving SkyBitz as the remaining defendant. The remaining parties briefed the terms in contention and orally argued the disputed issues on June 5 at the *Markman* hearing. The Court construed the disputed terms in its *Markman* order dated June 19, 2105. (Dkt. #53).

In ORBCOMM, the Markman hearing is scheduled for September 10, 2015. Initially, there was discussion about consolidating the *Honeywell/SkyBitz* case with the Orbcomm case, at least for purposes of the *Markman* proceedings. Ultimately, the ORBCOMM Defendants decided to proceed separately.

In response to Rule 4-1, Plaintiff informed the OBCOMM Defendants that he would not be seeking the construction of any additional terms, and he referred ORBCOMM Defendants to his claim construction disclosures, proposed claim construction, and opening claim construction brief in the *Honeywell/SkyBitz* case. The ORBCOMM Defendants indicated that they would be requesting that the Court construe the same claim terms that had been identified by SkyBitz in the *Honeywell* matter and that it would not be seeking the construction of any other terms. The ORBCOMM Defendants provided their Rule 4-2 proposed construction and extrinsic evidence for those terms on June 5, 2015, the day of the Markman hearing in the *Honeywell* consolidated case and a week after the Court's Rule 4-2 deadline of May 28, 2015.

When the parties in this case submitted their Rule 4-3 Joint Claim Construction and Prehearing Statement on June 18, 2015 (Dkt. #20) in this case, the Court had not yet issued its Claim Construction Memorandum and Order in the *Honeywell/SkyBitz* consolidated case. The Court's *Markman* opinion came out the following day, June 19. ("*Honeywell* Claim Construction Order") ("Exhibit C").

The claim terms identifed by ORBCOMM for construction in this case are the exact same terms identified by SkyBitz for constructon in the *Honeywell/SkyBitz* case. The Court has now recently contrued those terms in the *Honeywell/SkyBitz* case. While the cases are separate and the parties differ, the claim term definitions are not affected by the parties or the accused devices. The claim term meaning remains consistent. Under the circumstances, the *Markman* hearing in this case is essentially a rehearing of the June 5 proceeding. To the extent either party seeks a construction that differs from the Court's construction, this proceeding is functionally a request for reconsideration.

Smith is is not requesting reconsideration of the Court's previous construction in this case. The law has not changed, and there are no additional facts that would materially affect the arguments, particularly given the recency of the Court's opinion. To promote efficiency, the parties have conferred about the Court's *Markman* opinion and its effect on thee proceedings. The parties have agreed that only the terms "outputs…operable to be controlled / outputs to be controlled" will be submitted to the Court for construction in these proceedings. As a result, Plaintiff Smith will brief only on those terms. Plaintiff Smith accepts the Court's construction, and he will argue for the adoption of that construction in this case. The ORBCOMM Defendants will argue that those terms should be defined as "a physical port which directs electrical signals from the communications unit to the target that control a desired action on the target".

## IV. UNCONTESTED TERMS

The parties are not seeking reconsideration of the Court's construction of the other terms as set forth in the *Honeywell* Claim Construction Order (Exhibit "C"):

| CLAIM TERM OR PHRASE | COURT'S CONSTRUCTION OR AGREED CONSTRUCTION |
|---|---|
| selectively communicate only with | "No construction necessary – ordinary meaning." |
| selectable port wiring interface for selective wiring / selective wiring of said plurality of ports / selective wiring of said selectable port | <u>selectable port wiring interface for selective wiring</u>: "configurable wiring interface capable of providing at least one selected wired electrical connection"<br><br><u>selective wiring of said plurality of ports</u>: at least one selected wired electrical connection provided by the configurable wiring interface<br><br><u>selective wiring of said selectable port</u>: selected wired electrical connections provided by the plurality of ports |
| common database | "No construction necessary – ordinary meaning." |

| | |
|---|---|
| inputs to be controlled | inputs to be controlled: "inputs to be monitored" |
| inputs…operable for monitoring / inputs to be monitored | inputs to said wireless communication unit are operable for monitoring: "signals provided to the wireless communication unit via a wired electrical connection that may be monitored"<br><br>inputs to be monitored: "signals provided to the wireless communication unit via a wired electrical connection that may be monitored" |
| definition information / definitions of said…inputs to be controlled / monitored, said…outputs to be controlled, and said selective wiring of said selectable port wiring interface / definitions of said inputs to be monitored, said outputs to be controlled, and said selective wiring of said selective wiring of said plurality of ports | definition information: "configuration information"<br><br>definitions of said one or more inputs to be controlled, said one or more outputs to be controlled, and said selective wiring of said selectable port wiring interface: "configuration information that defines at least the relevant inputs, outputs, and the ports that the inputs and outputs are physically connected to" |

V. **PLAINTIFF'S PROPOSED CLAIM CONSTRUCTION FOR THE FOLLOWING DISPUTED TERM IN THE '686 PATENT: "outputs…operable to be controlled / outputs to be controlled ['686 patent claims 15, 29 and 48]"**

| CLAIM TERM | COURT'S CONSTRUCTION (*Honeywell*) | DEFENDANTS' PROPOSED CONSTRUCTION |
|---|---|---|
| outputs…operable to be controlled / outputs to be controlled | outputs for said wireless communication unit are operable to be controlled: "signals provided from the wireless communication unit via a wired electrical connection that may be controlled"<br><br>outputs to be controlled: "signals provided from the wireless communication unit via a wired electrical connection that may be controlled" | "a physical port which directs electrical signals from the communications unit to the target that control a desired action on the target" |

The Defendants' proposed definition for the phrases "outputs for said wireless communication unit are operable to be controlled" and "outputs to be controlled" is virtually identical to the proposed construction asserted by SkyBitz and rejected by the Court in the *Honeywell* claim construction proceedings. Exhibit C at 42-49. For comparison, their proposed definitions are as follows:

8

**SkyBitz**: "electrical signal outputs from the communications unit to the target that controls a desired action on the target"

**ORBCOMM**: "a physical port which directs electrical signals from the communications unit to the target that control a desired action on the target"

The Court's construction in *Honeywell* for these two phrases has four elements: (1) signals; (2) from the communication unit; (3) via a wired electrical connection; (4) that may be controlled. Three of these four elements come straight from the claim language or the specification, and they should not be controversial. The other element arises implicitly from the term "output".

The specification explicitly says that outputs are signals, and the Court found that the intrinsic evidence indicated that the recited "outputs" include signals. Exhibit C at 45. The Court specifically noted that the '686 patent specification states that "[t]he outputs and inputs are electrical signals that are used with the target and are related to the type of target and may include a wide range of signals." Exhibit C at 45 (citing '686 Patent at 9:53-56). Smith, SkyBitz, and the ORBCOMM Defendants have all proposed definitions that use "signals". Thus, the Court determined that "outputs" are signals.

All parties have also agreed that the outputs are "from the communication unit/monitoring unit". The claim term uses the phrase "for said wireless communication unit". In other words, outputs are communication unit/monitoring unit signals. Thus, the Court incorporated "from the communication unit" into its construction.

The Court's third element "via a wired electrical connection" is not part of the claim language, and for that reason, it was not included in Smith's proposed definition, or even in the defendants' proposed definitions for that matter. Yet, the term "output" expresses the idea of a signal in transit—a signal that is moving. An electrical signal that moves from one point to

9

another has to be carried along some medium. So there must be some way to carry the electrical signal, and in today's computer technology that connection is via a wired electrical connection. That is in fact what the circuitry does.

While this element is not apparent from the claim language itself, it may be implicit in it. It is difficult to imagine how a signal could be transmitted otherwise. Signals can be communicated wirelessly, but to do so the signal would first have to be transmitted via a wired electrical connection to a transceiver, where the electrical signal is encoded and then broadcast electromagnetically.

The fourth and final element of the Court's construction is simply that the outputs "may be controlled". This is a restatement of the claim language "operable to be controlled". It is consistent with the intent of patent as evidenced by the claims and the specification. One of the features of the patented system is that the "outputs" may be configured to satisfy the user's needs and desires. While these "outputs" may be controlled, the patent does not limit what they may control. The patented invention is designed to be used with virtually any device, sensor or mechanism, whether presently available or to be developed. The patented system was created "to be used for a wide variety of tracking, monitoring, and logistics purposes." '686 Patent, Exhibit B at 14:36-41.

These four elements elegantly capture the full meaning of the phrase "outputs for said wireless communication unit are operable to be controlled". Nothing has been missed. Arguably, the third element goes beyond the claim language into the implications of the claim language. For these reasons, Plaintiff Smith's position is that the Court should adopt its claim construction in the *Honeywell* case.

The ORBCOMM Defendants, like SkyBitz, attempt to import extraneous limitations that

are simply not part of the claim term. At times, these additional limitations directly conflict with the intent of the '686 patent. Here, the ORBCOMM Defendants request that the Court require that the outputs control some feature of the "target". This is exactly what SkyBitz argued in the *Honeywell* case, and this is exactly what the Court rejected in *Honeywell*. Exhibit C at 48.

This proposed limitation is not found anywhere in the claims, and it directly conflicts with the intent of the patent. The Defendants seek to limit "outputs" to signals that directly control specific aspects of the target vehicle. For example, Defendants want to limit "outputs" to signals that lock and unlock the doors or enable and disable the engine. "Outputs" include those things, but are not limited to those things. Exhibit C at 48.

The patented invention is designed to give the user much more versatility. The '686 patent specification explains that the invention is intended to allow virtually unlimited versatility: "Monitoring device may be used to produce outputs such as door locks, ignition kill, to produce an audible alarm for the driver, *or to effect [sic] any other feature that can be electrically interfaced to the monitoring device.*" Exhibit B at 7:45-49 (emphasis added).

"Outputs" may also give the user the option of controlling components in the monitoring unit as well as components on or near the target. For example, claim 51 explicitly describes "outputs" to turn on/off the GPS and "outputs" to reprogram the microcontroller. "Outputs" can be used to set a flag in the memory device of the communication/monitoring unit. Exhibit A at 8:1-5. This why the Court held in *Honeywell*: "To the extent that Defendant argues that controlling the power to the GPS would not control a desired action on the target, the Court rejects this argument." Exhibit C at 48.

"Outputs" could also be used to control some device on or near the target. For example, a device could be installed on a container to measure ambient temperature and humidity, and it

11

could be programmed to activate a dehumidifier inside the container when the ambient temperature is outside specified parameters. "Outputs" could be used to turn this device on/off or to reset the parameters. This example is not specifically described in the specification, but it is within the intended spirit of the invention. The specification explains: "various changes may be made in the system integration and components as well as in the details of the illustrated arrangements or combinations of features without departing from the spirit of the invention." '686 Patent, Exhibit B at 14:36-41. This is why the Court in *Honeywell* held "Thus, to the extent that Defendant's construction would exclude a feature used with a vehicle, the Court rejects this construction." Exhibit C at 48.

The ORBCOMM Defendants' proposed definition is openly designed to reinsert limitations that require direct control of the target vehicle. The ORBCOMM Defendants propose the following "a physical port which directs electrical signals from the communications unit to the target that control a desired action on the target". First, the ORBCOMM Defendants seek to improperly import a requirement of a "physical port" that directs electrical "signals to the target", and then they seek to impose the limitation that the signals "control a desired action on the target", a limitation inconsistent with the express intent of the patent and a limitation rejected by the Court. Exhibit C at 46-48.

A "physical port [sic] which directs signals . . . to the target" is simply not part of the phrase "outputs for said wireless communication unit are operable to be controlled" or the term "outputs to be controlled". These signals may enter a physical port; they may exit a physical port: or they may go through a physical port; but these output signals are not a physical port, much less one that directs signals to the target. The '686 patent identifies ports or interfaces when it intends to claim them as part of some structure in the invention. When the patent does

12

not include "ports" in a language of a claim element or phrase in the patent, this means that "port" is not intended to be there. If the ORBCOMM Defendants' definition were inserted into the claims in place of the phrase it is intended to define, it would not make any sense, and the term "physical port" would conflict with other parts of the claims where the term "port" is actually used.

The notion that the patent requires a physical port that directs signals to the target was considered and rejected by the Court. The Court noted that Claim 15 states that the wiring interface is used to wire the "wireless communication units to said plurality of targets", but the Court astutely pointed out that "[t]his is not necessarily the same as requiring the outputs to be from the communication unit to the 'target'". Exhibit C at 48. The Court then concluded: "The specification further states that '[m]onitoring device 10 may be used to produce outputs such as door locks, ignition kill, to produce an audible alarm for the driver, **or to effect any other feature that can be electrically interfaced to monitoring device** 10.' '686 Patent at 7:46–49." Exhibit C at 48 [emphasis added]. The Court's analysis is consistent with the patentee's intention to allow for user flexibility and versatility, which is specifically called out in the specification.

Claim 51 explicitly claims "outputs" to control the microprocessor in the monitoring unit, i.e., reprogramming the computer in the monitoring unit. Exhibit A, Reexam Certificate at 8:1-5. The "output" claimed here is not a signal to the target unless the monitoring unit is categorized broadly as part of the target, but a signal from the monitoring unit to the microprocessor. In this particular claim, the '686 patent envisions sending "outputs" to control how, when, where and to whom the computer sends location information, but in other applications, outputs to the microprocessor could be used to program it in any way desired. Claim 51 also describes outputs

to the GPS to turn it on and off for power conservation. Here too, the signal is not to the target as the ORBCOMM Defendants use that phrase. It is a signal from the monitoring unit to the GPS, which is a component in the monitoring unit. The ORBCOMM Defendants' definition of "outputs" completely reads out these specifically claimed applications. That definition undermines the intent of the patent and limits out claimed subject matter.

Like SkyBitz, ORBCOMM Defendants define "outputs to be controlled" to require that the output "controls a desired action on the target." In *Honeywell*, the Court found that this additional language was unwarranted and directly inconsistent with the patent's claims. Exhibit C at 48. As the Court noted in its *Markman* opinion, the "intrinsic evidence indicates that the outputs are signals from the communication unit, but they do not necessarily control an action on the target." Exhibit C at 48. Here again, Claim 51 is instructive. Claim 51 states, "The monitoring system of claim 48, wherein said one or more outputs to be controlled comprise a power control for said global position sensor, setting a flag in a memory to be operated on by a microcontroller, and controlling said microcontroller to send said location information." Exhibit A at 8:1-5. Here the claim specifically identifies the power to the GPS as one of the outputs to be controlled. This is not "a desired action on the target." Exhibit C at 48. The specification recognizes this option: "It will also be noted that monitoring device 10 may be programmed to control power itself . . . ." '686 Patent, Exhibit B at 6:28-30.

## VI. CONCLUSION

For the reasons articulated, the Court should construe "outputs for said wireless communication unit are operable to be controlled" and "outputs to be controlled" to mean "signals provided from the wireless communication unit via a wired electrical connection that may be controlled."

Respectfully submitted

ANDERSON & CUNNINGHAM, P.C.

/s/ *David K. Anderson*
_____
David K. Anderson
david@andersonlawfirm.com
SBT No. 01174100
Four Houston Center
1221 Lamar, Suite 1115
Houston, Texas 77010
Telephone: 713-655-8400
Telephone (Direct): 713-655-7665
FAX: 713-655-0260
ATTORNEY-IN-CHARGE FOR
PLAINTIFF JOSEPH SMITH

OF COUNSEL:

ANDERSON & CUNNINGHAM, P.C.

Julie B. Cunningham
julie@andersonlawfirm.com
SBT No. 05240700
Four Houston Center
1221 Lamar, Suite 1115
Houston, Texas 77010
Telephone: 713-655-8400
FAX: 713-655-0260

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing instrument was filed electronically pursuant to Local Rule CV-5(a) and that a copy of this document was served upon all counsel of record pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5(b)(1) via the Court's CM/ECF on this 30th day of July, 2015.

/s/ *David K. Anderson*
_____
David K. Anderson