**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| JOSEPH SMITH, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Case No. 2:14-CV-666 (Lead Case) |
| ORBCOMM, INC., and STARTRAK INFORMATION TECHNOLOGIES, LLC. | § § § | |
| *Defendants.* | § § | |

## MEMORANDUM OPINION AND ORDER

On September 8, 2015, the Court held a hearing to determine the proper construction of the disputed claim terms in United States Patent No. 6,611,686 ("the '686 Patent"). After considering the arguments made by the parties at the hearing and in the parties' claim construction briefing (Dkt. Nos. 22, 25, & 27 in this case; Dkt. Nos. 39, 44, & 45 in *Smith v. Honeywell International, Inc.*, Case No. 2:14-cv-665 ("the 665 case")), the Court issues this Claim Construction Memorandum and Order.

## TABLE OF CONTENTS

I. PROCEDURAL BACKGROUND ..................................................................................... 3

II. BACKGROUND - THE '686 PATENT .......................................................................... 4

III. APPLICABLE LAW ....................................................................................................... 7

IV. CONSTRUCTION OF AGREED TERMS .................................................................... 10

V. CONSTRUCTION OF DISPUTED TERMS ................................................................. 11

  1. "said inputs to be controlled" ........................................................................ 11

  2. "outputs for said wireless communication unit are operable to be controlled" and "outputs to be controlled" ............................................................................ 29

I. CONCLUSION ............................................................................................................... 47

## I.      PROCEDURAL BACKGROUND

On June 3, 2014, Plaintiff filed a complaint against ORBCOMM and StarTrak Information Technologies (collectively "the ORBCOMM Defendants") asserting infringement of United States Patent No. 6,611,686 ("the '686 Patent").   On the same day, Plaintiff filed a complaint against Honeywell International also asserting infringement of the '686 Patent.   The case is styled *Joseph Smith v. Honeywell International, Inc.*, Case No. 2:14-cv-665-JRG ("the 665 case").   On July 14, 2014, Plaintiff filed a complaint against SkyBitz also asserting infringement of the '686 Patent.   The case is styled *Joseph Smith v. SkyBitz, Inc.*, Case No. 2:14-cv-772-JRG ("the 772 case").   On October 13, 2014, the Court consolidated the 665 case and the 772 case (Dkt. No. 5 in the 665 case), and issued a docket control order for the consolidated 665 case (Dkt. No. 19 in the 665 case).   At that time, this case was operating under a different docket control order from the one in the consolidated 665 case.   The dates in the docket control order for this case trailed the dates in the docket control order in the consolidated 665 case by approximately two months (Dkt. No. 16).

On June 5, 2015, a claim construction hearing was held in the 665 case.   SkyBitz was the only defendant remaining in the consolidated 665 case and presented arguments at the hearing. On June 19, 2015, the Court issued a claim construction order construing the terms disputed in the 665 case (Dkt. No. 53 in the 665 case).

After Plaintiff submitted its claim construction brief in this case, the Court: (1) consolidated the 665 case with this case for pretrial proceedings; (2) vacated the claim construction order in the 665 case; and (3) ordered that the previously submitted briefs in the 665 case would be considered as having been submitted in this case (Dkt. No. 23).   On September 8, 2015, the Court held a second hearing to determine the proper construction of the disputed claim

terms in the '686 Patent. Prior to the hearing, the parties in this case and the 665 case agreed that the Court should adopt its vacated constructions for a majority of the terms/phrases.

## II.    BACKGROUND - THE '686 PATENT

The '686 Patent is titled "Tracking Control and Logistics System and Method." It was filed on May 24, 1999, and issued on August 26, 2003. On May 27, 2008, a third party requested an *Ex Parte* Reexamination of the '686 Patent, and the reexamination proceeding was assigned Control No. 90/009,121 ("the '121 proceeding"). On September 3, 2009, a third party requested a second *Ex Parte* Reexamination of the '686 Patent, and the reexamination proceeding was assigned Control No. 90/010,601 ("the '601 proceeding"). The United States Patent and Trademark Office ("USPTO") merged the '121 proceeding and the '601 proceeding on May 25, 2010. On March 15, 2011, the USPTO issued an *Ex Parte* Reexamination Certificate, which canceled claims 4, 18, 19, 21, 33–35, 37–39 and 42; amended claims 1, 3, 5, 6, 7, 11, 12, 15, 16, 20, 22–24, 26, 27–29, 36, 40, 44 and 45; and added new claims 46–51.

The '686 Patent generally relates to a method and system used for monitoring, tracking, and logistics purposes that preferably includes a monitoring unit having a microcontroller for processing data.[1] As background, the '686 Patent states that "it is expensive and difficult to

---

[1] The Abstract of the '686 Patent follows:

> A system, apparatus, and method are disclosed for monitoring, tracking, and logistics purposes that preferably includes a monitoring unit wherein data is processed using a microcontroller. The monitoring unit includes an interface with the target or asset to be tracked such that electrical signals may be sent between the target and monitoring unit to denote events from the target, e.g., air bag deployment and for activating features of the target, e.g., an alarm. The interface may be unique for each monitoring unit because unique information relating to each interface is stored in the system database, e.g., data may be related to a temperature in one unit and to a movement sensor indication in another. Therefore, the system may respond appropriately to signals having unique meanings from each different monitoring unit. A pager unit with a pager modem is controlled by the microcontroller to thereby encode the signals for transmission. A pager transmitter/receiver network is used for sending and receiving messages

monitor moveable assets such as cargo, vehicles, trucks, cargo containers, and the like." '686 Patent at 1:15–18.  The specification further states that "[i]t would be desirable to provide a low cost, reliable device with the ability to locate assets anywhere and anytime," by enabling communication "between the asset and a central control center using any type of required data or information." *Id.* at 1:18–19.  The specification asserts that "[t]he present invention provides a device which costs a fraction of presently available devices and also operates at a fraction of the cost of presently available services that allow for monitoring, controlling, and logistics." *Id.* at 1:66–2:2.

Specifically, the specification states that "one preferred embodiment of the monitoring device for monitoring a target comprises a microcontroller programmed for operating the monitoring device." *Id.* at 2:8–10.  The specification adds that "[a] pager controlled by the microcontroller is operable for communicating with a pager network." *Id.* at 2:10–12.  The specification further states that "[a] global positioning sensor is included for providing location information." *Id.* at 2:14–15.  The specification also states that "[a]n interface is provided between the monitoring device and the target for communicating signals relating to the target." *Id.* at 2:15–17.

Regarding the interface, the specification states that it connects inputs, outputs, and status signals to the monitoring device preferably via cabling. *Id.* at 6:60–62.  The specification also states that "inputs for any particular monitoring device 10 may be different, e.g., if there are one thousand monitoring devices 10 in operation, each device may be configured differently." *Id.* at 7:1–4.  According to the specification, "[t]he flexibility comes because during initialization of

from the monitoring unit.  The pager transmitter/receiver network is in communication with a server and the database.  The server may be accessed by multiple clients over the Internet or other lines of communication so that the clients at numerous different remote locations may activate controls on their respective one or more remote targets/assets, find the locations thereof, and receive cumulative status reports.

monitoring device 10, the various inputs 42 and outputs 44 are listed and entered into a database of system 100 where they are defined along with any desired response that a client may wish system 100 to make, e.g., e-mail, telephone call, pager alarm, etc." *Id.* at 7:4–8.   The specification adds that "[i]nputs to monitoring device 10 for use with a vehicle may include, for example only, a panic button, air bag deployment, siren, lights, auxiliary signals, cargo door sensor (open/close), or a threshold indicator such as cargo temperature exceeds a threshold." *Id.* at 7:8–13.

The specification further states that "monitoring device 10 may be used to produce outputs such as door locks, ignition kill, to produce an audible alarm for the driver, or to effect any other feature that can be electrically interfaced to monitoring device 10." *Id.* at 7:46–49. The specification adds that "system 100 can remotely control the outputs," and that "a client who logs onto system 100 through the Internet, and who may be in another country, can effect a desired output through monitoring device 10." *Id.* at 7:56–58.

Claim 15 of the '686 Patent is representative of the asserted claims and recites the following elements (disputed terms in italics):

15. A monitoring system for monitoring a plurality of targets on behalf of a plurality of clients, each of said clients being associated with one or more of said plurality of targets, comprising:
a computer network server operable for communicating with a plurality of client computers through an Internet connection;
a common database of said computer network server operable for storing information relating to each of said plurality of targets; a wireless network system, said computer network server being in communication with said wireless network system; [and]
a plurality of wireless communication units for said plurality of targets, each of said plurality of wireless communication units being operable for communication with said wireless network system, each of said plurality of wireless communication units including a global position sensor to provide location information for each of said plurality of targets, said computer network server permitting each of said plurality of client computers to selectively communicate only with said one or more of said plurality of targets with which said client is associated such that each of said plurality of client computers is operable for sending a message to request said location

information relating to said one or more of said plurality of targets with which said client is associated;

said plurality of wireless communication units each comprising a selectable port wiring interface for selective wiring of each of said plurality of wireless communication units to said plurality of targets whereby one or more inputs to said wireless communication unit are operable for monitoring by a respective of said plurality of client computers and one or more *outputs for said wireless communication unit are operable to be controlled* by said respective of said plurality of client computers and;

said common database being configured for storing definition information for said plurality of wireless communication units comprising definitions of said one or more *inputs to be controlled*, said one or more *outputs to be controlled* and said selective wiring of said selectable port wiring interface for said plurality of wireless communication units;

a controller at said wireless communication unit for operating said wireless communication unit, said controller having a memory for programming said controller for operating said wireless communication unit; and

said plurality of wireless communication units comprising a modem for encoding said location information, said wireless network system comprising a wireless communication network system, said modem of said wireless communication unit being operable for a task, of sending messages comprising said location information through said wireless communication network system, whereupon said information is stored in said common database.

### III.   APPLICABLE LAW

#### A.  Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To determine the meaning of the claims, courts start by considering the intrinsic evidence.  *See id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).   The intrinsic evidence includes the claims themselves, the specification, and the prosecution history.  *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861.  Courts give claim terms their ordinary and accustomed meaning as

understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification

will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323.  The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent.  *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'"  *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862).  Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent.  *Id*. at 1318.  Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court.  *Id*.  Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms."  *Id*.

## B.  Construction Indefiniteness

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112(b).  Whether a claim meets this definiteness requirement is a matter of law. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1344 (Fed. Cir. 2007).  A party challenging the definiteness of a claim must show it is invalid by clear and convincing evidence.

*Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1368 (Fed. Cir.2014).   The ultimate issue is whether someone working in the relevant technical field could understand the bounds of a claim. *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010).   Specifically, "[a] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

### IV.   CONSTRUCTION OF AGREED TERMS

The parties have agreed to the construction of the following terms:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "selectively communicate only with" | No construction necessary – ordinary meaning |
| "common database" | No construction necessary – ordinary meaning |
| "selectable port wiring interface for selective wiring" | "configurable wiring interface capable of providing at least one selected wired electrical connection" |
| "selective wiring of said plurality of ports" | "at least one selected wired electrical connection provided by the configurable wiring interface" |
| "selective wiring of said selectable port" | "selected wired electrical connection provided by the plurality of ports" |
| "inputs to said wireless communication unit are operable for monitoring" | "signals provided to the wireless communication unit via a wired electrical connection that may be monitored" |
| "inputs to be monitored" | "signals provided to the wireless communication unit via a wired electrical connection that may be monitored" |
| "definition information" | "configuration information" |
| "definitions of said one or more inputs to be controlled, said one or more outputs to be controlled, and said | "configuration information that defines at least the relevant inputs, outputs, and the ports that the inputs and outputs are physically connected to" |

| | |
|---|---|
| selective wiring of said selectable port wiring interface" | |
| "definitions of said inputs to be monitored, said outputs to be controlled, and said selective wiring of said selective wiring of said plurality of ports" | "configuration information that defines at least the relevant inputs, outputs, and the ports that the inputs and outputs are physically connected to" |

Dkt. No. 28-1 (P.R. 4-5(d) Claim Chart of Disputed Terms).  In view of the parties' agreements on the proper construction of each of the identified terms, the Court hereby **ADOPTS** the parties' agreed constructions.

The Court further finds that in the August 3, 2015 Order consolidating this case and the 665 case, the Court ordered that the previously submitted briefs in the 665 case would be considered as having been submitted in this case (Dkt No. 23).  In view of the parties agreed constructions in this case, the Court finds that the arguments submitted for these agreed terms in the 665 case are withdrawn and considered MOOT. (Dkt. Nos. 39, 44, & 45 in the 665 case.)

## V.    CONSTRUCTION OF DISPUTED TERMS

The parties' dispute focuses on the meaning and scope of two phrases in the '686 Patent.

### 1.    "said inputs to be controlled"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "said inputs to be controlled" | "signals or data to the wireless communication unit that may be reported and/or controlled" | Indefinite |

### a)  The Parties' Positions

The ORBCOMM Defendants argue that the '686 Patent does not warrant judicial correction, as Plaintiff contends.  The ORBCOMM Defendants also argue that the phrase "said one or more inputs to be controlled" is indefinite because: (1) it lacks antecedent basis; and (2) it is unclear what the claim phrase means in the context of the claims under 35 U.S.C. §112(b).

Defendant SkyBitz argues that the phrase "said one or more inputs to be controlled" is indefinite because: (1) it lacks antecedent basis; (2) it is unclear what the claim phrase means in the context of the claims under 35 U.S.C. §112, ¶ 2; and (3) the phrase does not comply with the 35 U.S.C. § 112, ¶ 1 requirement to provide written descriptive support for the same.

Turning to the ORBCOMM Defendants' arguments, the ORBCOMM Defendants contend that a district court may not correct an error unless it is obvious from the face of the patent that there is an error. (Dkt. No. 25 at 12.)[2]  The ORBCOMM Defendants further argue that the Court may not refer to the prosecution history to determine whether there is an obvious error. (*Id.* at 13.)  The ORBCOMM Defendants contend that Plaintiff cannot cite to any evidence that there is an obvious error on the face of the patent. (*Id.*)  The ORBCOMM Defendants argue that this is not a case of a misspelling, an obviously missing word, or substitution of a word or phrase that renders the language incoherent. (*Id.*)

The ORBCOMM Defendants further argue that Plaintiff's initial position in the 665 case demonstrates that there is not an obvious error. (*Id.*)  The ORBCOMM Defendants contend that Plaintiff proposed a construction for the term and did not initially suggest that the word "controlled" was inserted in error. (*Id.*)  According to the ORBCOMM Defendants, if Plaintiff did not believe there was an error, it is impossible to conclude that there is an error that is obvious on the face of the patent. (*Id.* at 14.)

The ORBCOMM Defendants further argue that even if there were an error that is obvious on the face of the patent, Plaintiff's position should be rejected because the proper correction is open for debate. (*Id.*)  The ORBCOMM Defendants contend that courts have refused to correct a claim where there are competing potential corrections as indicated by multiple proposed

---

[2]   All references to page numbers refer to the pagination system assigned by ECF, not the original internal pagination of the document.

corrections. (*Id.*)  According to the ORBCOMM Defendants, the proper standard has not been met here because there are multiple potential corrections, and it is not immediately clear which correction is appropriate. (*Id.* at 15.)  The ORBCOMM Defendants further argue that given that Plaintiff did not request correction until after the now-vacated construction was entered, the facts in this case weigh against finding that the claim is subject to judicial correction. (*Id.* at 16.)

The ORBCOMM Defendants also argue that the term is indefinite under 35 U.S.C. § 112(b), and is also indefinite because it lacks an antecedent basis. (*Id.*)  The ORBCOMM Defendants contend that the Court's prior conclusion that the term contains a clear error leads inexorably to the conclusion that the claim language is indefinite. (*Id.* at 17.)  The ORBCOMM Defendants further argue that the claim language has a broader indefiniteness issue because the specification does not provide any disclosure or teaching about exerting control over the "inputs." (*Id.*)  The ORBCOMM Defendants contend that the Court is left to choose between any number of potential constructions without any guidance. (*Id.*)  The ORBCOMM Defendants argue that where there are multiple potential constructions of a term, the claim is indefinite. (*Id.*)

The ORBCOMM Defendants further argue that one skilled in the art is left without any guidance about: (a) who or what exerts the control over the inputs, (b) how the control is exerted, and (c) the extent of the control that is exerted over the inputs. (*Id.*)  The ORBCOMM Defendants contend that the claim language is written in the passive voice so it does not designate who or what exerts the control. (*Id.* at 18.) The ORBCOMM Defendants further contend that neither the claim term nor the specification offers any insight into what aspects of the inputs may be controlled or how the control is exerted. (*Id.*)  Finally, the ORBCOMM Defendants argue that it is impossible to determine exactly what level of control is intended. (*Id.*) According to the ORBCOMM Defendants, it is impossible to choose between multiple potential

constructions of the claim term because the specification does not provide any teaching about exerting controls over inputs. (*Id.* at 19.)

Turning to Defendant SkyBitz's arguments, Defendant SkyBitz contends that the "introductory" clause in claims 15 and 48 of "whereby one or more inputs to said wireless communication unit are operable for monitoring" does not provide antecedent basis support for the claims' "subsequent" clause that a common database stores "definitions of said one or more inputs to be controlled." (Dkt. No. 44 at 13-14 in the 665 case.)  Defendant SkyBitz argues that the "whereby" input and output clauses of claims 15 and 48 are material to patentability because the recited "one or more inputs" and "one or more outputs" are claim element noun inputs and outputs defining structure of the monitoring system. (*Id.* at 14.)   According to Defendant SkyBitz, these inputs and outputs must also have the further limitations of their stated operability, and the overall claimed system is not operative without them. (*Id.*)

Defendant SkyBitz further argues that the antecedent basis issue raised does not involve a typographical or obvious error or an antecedent basis by implication. (*Id.* at 15.)  Defendant SkyBitz contends that the interrelation of the "introductory" and "subsequent" clauses in claims 15 and 48 are beyond dispute. (*Id.*)   Defendant SkyBitz argues that each claim has an "introductory" clause that defines "the plurality of wireless communication units" as "each comprising a selectable port wiring interface for selective wiring of each of said plurality of wireless communication units to said plurality of targets whereby…." (*Id.*)  Defendant SkyBitz further contends each claim has a "subsequent" clause which concerns the common database definition information for said plurality of wireless communication units. (*Id.*)

Defendant SkyBitz argues that the "subsequent" clause recites the definition information as comprising definitions of the claim elements and limitations recited in the "introductory"

clause. (*Id.*)  Defendant SkyBitz further contends that multiple claim elements and limitations are recited and linked, namely the wireless communication units and their selective wiring, selectable port wiring interface, inputs, and outputs. (*Id.*)  According to Defendant SkyBitz, claims 15 and 48 are unclear because "one or more input . . . operable for monitoring" does not provide antecedent basis support for the subsequently recited "said one or more inputs to be controlled." (*Id.*)  Defendant SkyBitz further argues that independent claim 29 does not have this incongruity because it consistently references inputs to be monitored and outputs to be controlled. (*Id.* at 16.)

Defendant SkyBitz also argues that the interrelation of the "introductory" and "subsequent" clauses of claims 15 and 48 was the basis for the examiner's reasons for the issuance of the Reexamination Certificate. (*Id.*)  Defendant SkyBitz contends that the examiner understood that the "ports…are selectable for connection to individually selectable inputs (inputs to monitoring device from target) and individually selectable outputs (outputs from monitoring device to control target)." (*Id.*)  Defendant SkyBitz argues that claim 29 correctly references inputs to be monitored and outputs to be controlled. (*Id.*)  Defendant SkyBitz contends that claims 15 and 48 lack of antecedent basis is compounded by the incongruent ambiguity of how a directionally wired input connection for monitoring can be controlled. (*Id.* at 17.)

Defendant SkyBitz also argues that the limitation of "said inputs to be controlled" in claims 15 and 48 is indefinite because it is unclear what the claim phrase means in the context of the claims. (*Id.*)  Defendant SkyBitz argues that the claim phrase "said one or more inputs to be controlled" is indefinite because it is unclear how selective port wiring inputs "operable for monitoring" are to be controlled. (*Id.* at 18.)  Defendant SkyBitz contends that it is also uncertain what the control of "said one or more inputs to be controlled" is, where it comes from, and how

it operates. (*Id.*)   Defendant SkyBitz further argues that it is unclear whether the inputs'
directional connection (from target to unit) for monitoring somehow involves the outputs'
directional connection (from unit to target) to be controlled. (*Id.* at 18-19.)   Defendant SkyBitz
also argues that it is indiscernible how the common database's "definitions" of the "said one or
more inputs to be controlled" interacts with the claims' recited selective port wiring inputs. (*Id.*
at 19.)  Finally, Defendant SkyBitz argues that it is unclear whether the "one or more inputs . . .
operable for monitoring" can be controlled. (*Id.*)   According to Defendant SkyBitz, the
cumulative effect of the above uncertainties presents incongruity and a lack of clarity which is
unresolved and cannot be reasonably ascertained by a person of ordinary skill in the art from the
subject claims and their intrinsic record. (*Id.*)

Regarding Plaintiff's alternative construction, Defendant SkyBitz argues that it conflates
physical claim elements and limitations with newly introduced functional operability. (*Id.* at 20.)
Defendant SkyBitz also argues that claims 15 and 48 recite physical structures of the wireless
communication units and their selective wiring. (*Id.*)   Defendant SkyBitz contends that
Plaintiff's construction renders the recited structure superfluous as if the existence of
"definitions" in a common database by itself accomplishes the telling of what to do and controls
the input and output functions. (*Id.*)  Defendant SkyBitz argues that the terms "signals," "data,"
and "reported" do not appear in claims 15 and 48. (*Id.*)  Defendant SkyBitz further contends that
the subject claims do not explain how "signals or data" relate to or allow "one or more
inputs…operable for monitoring" to be "inputs to be controlled." (*Id.* at 20-21.)   Defendant
SkyBitz argues that Plaintiff's construction does not explain the relationship of "signals or data"
to the subject claims' recitation of structural claim elements, including "inputs" and monitored
"targets." (*Id.* at 21.)  According to Defendant SkyBitz, Plaintiff's construction sheds no light on

the several incongruent ambiguities presented by "said one or more inputs to be controlled" in relation to "one or more inputs . . . operable for monitoring." (*Id.*)

Finally, Defendant SkyBitz argues that claims 15 and 48 are invalid because they do not comply with 35 U.S.C. § 112, ¶ 1, for failure to provide written descriptive support for the claims. (*Id.* at 21.) Defendant SkyBitz contends that the specification of the '686 Patent provides no support for how a wireless communication with configured selective port wiring "inputs" "operable for monitoring" are "to be controlled." (*Id.* at 22.) Defendant SkyBitz argues that there is no reference to "inputs…operable for monitoring" being "inputs to be controlled" in the specification or claims of the '686 Patent as originally filed. (*Id.* at 23.) Defendant SkyBitz also argues that the specification of the '686 Patent is devoid of any explanation on how an input operable for monitoring can be controlled. (*Id.*)

Defendant SkyBitz disagrees with Plaintiff's statement that "[t]he definition data tells the inputs and outputs what to do, and thereby controls both inputs and output functions." (*Id.* at 24.) According to Defendant SkyBitz, this statement cannot satisfy the § 112, ¶ 1 requirement that the full scope of each claim of a patent be supported by a specification description that clearly conveys the inventors were in possession of the claimed invention at the time the original application for patent was filed. (*Id.*) Defendant SkyBitz contends that the '686 Patent discloses that the configuration of the input/output port wiring is stored in a system database. (*Id.*) Defendant SkyBitz argues that the examiner understood that the '686 Patent taught individually selectable inputs to the monitoring device from the target (performing monitoring of the target) and individually selectable outputs from the monitoring device to the target (to control the target). (*Id.* at 24-25.) According to Defendant SkyBitz, the specification does not teach the discordant claims 15 and 48 recitals of how "one or more inputs . . . operable for monitoring"

can be "said one or more inputs to be controlled." (*Id.* at 25.)

Turning to Plaintiff's argument, Plaintiff contends that claims 15 and 48 contain a typographical error and that the phrase "inputs to be controlled" should be construed to read "inputs to be monitored." (Dkt. No. 27 at 4.)  In the alternative, Plaintiff contends that the Court should construe the disputed claim language "to be controlled" to refer to the definition data. (*Id.* at 4 n.1.)  For example, Plaintiff argues in the 665 case that the phrase "input to be controlled" should be construed to mean "signals or data to the wireless communication unit that may be reported and/or controlled."

Regarding Plaintiff's argument that claims 15 and 48 contain a typographical error, Plaintiff contends that the correction of an obvious clerical error is an appropriate exercise of the Court's inherent authority. (*Id.* at 4) (citing *Novo Indus. L.P. v. Micro Molds Corp.*, 350 F.3d 1348 (Fed Cir. 2003))  Plaintiff argues that a plain reading of the '686 Patent, along with prosecution history, make it evident that there are obvious clerical errors in claims 15 and 48. (*Id.*)  Plaintiff also argues that the examiner required that the claims recite the limitation that the "inputs/variables" were "to be monitored" and that the "outputs/items" were "to be controlled." (*Id.*) (citing Dkt. No. 27-1 at 6).  Plaintiff contends that this was the examiner's language and that the examiner amended the claims to include these phrases. (Dkt. No. 27 at 5.)

Plaintiff argues that the examiner's intent to require a global amendment of all independent claims as described above is undisputed. (*Id.* at 6.)  Plaintiff contends that when the examiner issued the amended claims, those claims inadvertently contained the phrase "to be controlled" phrase after the term "inputs" in claims 15 and 48. (*Id.*)  Plaintiff argues that the examiner intended the phrase "to be controlled" to follow "outputs" and "to be monitored" to follow "inputs". (*Id.*)  Plaintiff argues that the term "inputs" appears only twice in claims 15 and

48. (*Id.*)  Plaintiff further argues that the phrase "said one or more inputs" in claims 15 and 48 is referring to the "one or more inputs" introduced in the initial phrase "whereby one or more inputs to said wireless communication unit are operable for monitoring." (*Id.*)  Plaintiff contends that it follows that the substitution of inputs "to be controlled" for inputs "to be monitored" is an obvious clerical error that is clear from the face of the '686 Patent. (*Id.*)

Plaintiff also contends that there is no competing interpretation that suggests differing claim scope. (*Id.* at 7.)  Plaintiff argues that by correcting the clerical error, the Court would not in any real sense be "re-making" the claim, but merely giving it the meaning which was intended. (*Id.* at 7-8) (citing *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1359-60 (Fed. Cir. 2011)).  Plaintiff further contends that the cases cited by Defendants are readily distinguishable from the facts here. (*Id.* at 9.)  Plaintiff argues that in contrast to the facts in *Group One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1303 (Fed Cir. 2005), the clerical error is obvious from the face of the patent. (*Id.* at 9.)  Plaintiff also argues that, in contrast to the facts in *Imperium (IP) Holdings, Inc. v. Apple, Inc.*, 920 F. Supp.2d 747, 757-58 (E.D. Tex. 2013), there is no reasonable debate over claim meaning, and there are not differing interpretations that would lead to differing claim constructions. (*Id.* at 10.)  Plaintiff further contends that the term "inputs" is used consistently throughout the patent and the prosecution history. (*Id.*)

Plaintiff also contends that this is not a case that involves a proposal to correct an incomplete phrase or an attempt to add some unknown missing word. (*Id.* at 11.)  Plaintiff argues that this case is akin to *I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429, 442-43 (1926), where the Court held that an error may be found in a single claim where the patent examiner's remarks and surrounding language demonstrate that an error exists in the claim language. (*Id.*)  Plaintiff further argues that the '686 Patent consistently uses the phrases "inputs to be

monitored" and "inputs . . . operable for monitoring," which demonstrates that use of the phrase "inputs to be controlled" was an obvious clerical error. (*Id.* at 12.)

Plaintiff also argues that a challenge to the validity of any patent claim must meet the clear and convincing standard of persuasion. (*Id.*)  Plaintiff contends that the '686 Patent claims, read in light of the specification delineating the patent and the prosecution history, reasonably informs those skilled in the art about the scope of the invention. (*Id.* at 13.)   According to Plaintiff, Defendants have offered nothing to show that skilled artisans would not understand the scope or meaning of the claim terms. (*Id.*)  Plaintiff argues that the ORBCOMM Defendants did not assert that the term "inputs to be controlled" was indefinite and incapable of construction until they filed their responsive claim construction brief. (*Id.*)

Regarding its alternative construction, Plaintiff argues that the specification and the prosecution history clearly show that the definition data controls both the inputs and outputs. (Dkt. No. 27 at 4 n.1.)  Plaintiff also argues that its alternative construction does not change claim meaning in any way. (Dkt. No. 27 at 10.)  Plaintiff contends that one possible observation is that the phrase "to be controlled" refers to definition information, emphasizing that the definition information in the database controls the I/O devices. (*Id.* at 11.)  Plaintiff argues that the fact that the definition information controls components of the system (including the I/O interfaces) is not controversial. (*Id.*)   According to Plaintiff, looking at the phrase in this way does not impact the meaning of the claim. (*Id.*)   Plaintiff argues that this is true whether the language "to be controlled" is left in place, corrected as clerical mistake to "operable for monitoring", or even if it were taken out altogether. (*Id.*)  Plaintiff further argues that a skilled artisan would understand the claims to mean the exact same thing. (*Id.*)  Plaintiff contends that at the claim construction hearing in the 665 case, it argued that, if the phrase "to be controlled"

after the term "input" was a clerical error, it had no effect on the meaning and that would explain why neither the examiner nor the patentee caught the error. (*Id.*)

In the 665 case, Plaintiff argues that the "definitions of said one or more inputs to be controlled" is a database limitation, *i.e.*, it describes the database portion of the invention. (Dkt. No. 39 at 18 in the 665 case.)  Plaintiff contends that this fact puts the element in context and distinguishes the use of the phrase "inputs to be controlled" from the phrase "inputs operable . . . for monitoring" in other claim elements. (*Id.*)  Plaintiff further argues that the database is "configured for storing definition information" and that information includes "definitions of . . . inputs to be controlled, . . . outputs to be controlled, and . . . said selectable port wiring interface . . . ." (*Id.*)  Plaintiff argues that the inputs, outputs, and wiring interface are components of the invention, and they form part of the overall system. (*Id.*)  According to Plaintiff, the phrase "inputs to be controlled" is not indefinite or ambiguous in any way. (*Id.* at 19.)  Plaintiff argues that this phrase refers to the input systems that are controlled by the definition information contained in the database. (*Id.*)

Plaintiff further argues that the phrase must be read in the context in which it is used. (*Id.*)  Plaintiff contends that the phrase "outputs . . . are operable to be controlled" refers to the signals sent from the output component of the wireless communication unit to control various aspects of the system, such as turning off the engine. (*Id.*)  Plaintiff argues that the purpose of this element is to explain how the database functions and that the element is an integral part of the overall invention. (*Id.* at 20.)

Plaintiff also argues that the specification provides further support for what is indicated by the claims standing on their own. (*Id.*)  Plaintiff contends that the specification explains that the "database stores the relevant inputs and outputs, client specifications regarding inputs and

outputs, client messages and types of messages in response to signals, and so forth. " (*Id.* at 21) (citing '686 Patent at 12:53–55). Plaintiff contends that this information is stored in the database so that the database working with a server can operate the entire system. (Dkt. No. 39 at 21.) According to Plaintiff, this is why the claims use the phrase "definitions of said one or more inputs to be controlled, said one or more outputs to be controlled." (*Id.*) Plaintiff also argues that the notion of control over inputs is discussed elsewhere in the specification. (*Id.*) (citing '686 Patent at 1:41–44).

Plaintiff also argues that the prosecution history addresses the notion of controlling inputs and outputs. (*Id.*) Plaintiff contends that the terms "input" and "output" simply indicate direction with reference to a signal and are used to describe processes, not necessarily devices. (Dkt. No. 39 at 21.) Plaintiff further contends that the invention at issue is made of various components, and these components act in relation to one another. (*Id.* at 22.) Plaintiff argues that the various components have both input and output functions. (*Id.*) Plaintiff further argues that Defendants are incorrect in stating that inputs are for monitoring and outputs are for controlling. (*Id.*) Plaintiff contends that the phrase "definitions of said one or more inputs to be controlled" is understood as the definition data that tells the inputs and outputs what to do and thereby controls both the input and output functions. (*Id.* at 23.)

Plaintiff also argues that the examiner understood the term "control input" as input signal originating from the user's computer. (*Id.*) (citing Dkt. No. 39-6 at 20 in the 665 case (September 11, 2009 Office Action filed in *Ex Parte* Reexamination Control 90/009,121), Dkt. No. 39-7 at 11 in the 665 case (November 11, 2009 Office Action Response filed in *Ex Parte* Reexamination Control 90/009,121)). According to Plaintiff, the prosecution history shows the examiner and the patentee routinely using the term "control inputs" with seeming ease and clarity. (Dkt. No. 39

at 23.)

Plaintiff further argues that Defendant SkyBitz offers no conflicting interpretation of the phrase "inputs to be controlled." (*Id.* at 24.)  Plaintiff contends that the phrase "inputs to said wireless communication units are operable for monitoring" describes a process whereby a signal is carrying information to the wireless communication unit. (*Id.*)  Plaintiff argues that the phrase "database being configured for storing definition information for said plurality of wireless communication units comprising definitions of said one or more inputs to be controlled" is describing a particular type of database. (*Id.*)  According to Plaintiff, it describes a database that stores definition information, and this definition information controls the inputs on the wireless communication units. (*Id.*)

Plaintiff also argues that the words "monitor" and "control," as used in this patent, typically describe the type of information carried by a signal. (*Id.*)  Plaintiff contends that monitoring information is information about the target or the monitoring unit, and control information is information that directs a process. (*Id.*)  Plaintiff argues that it could be a process at or on the target, such as actuating a door lock, but it does not have to be. (*Id.*)  According to Plaintiff, the term "control output" by itself does not indicate what is being controlled, at least not until the term is read in the sentence or paragraph where it is used. (*Id.* at 25.)

In its reply brief in the 665 case, Plaintiff argues that there is no confusion among skilled artisans over the term "said inputs" or "inputs to be controlled." (Dkt. No. 45 at 7 in the 665 case.)  Plaintiff also argues that the wireless communication units have both input and output interfaces that are capable of sending and receiving signals. (*Id.*)  Plaintiff contends that the input/output interfaces are often the same physical device, which can be configured to function either as an input interface or an output interface or both. (*Id.*)  Plaintiff argues that Defendant

SkyBitz strains to find ambiguity where there is none. (*Id.*)  Plaintiff contends that the word "said" is used in the phrase "said inputs to be controlled" as a definite article. (*Id.* at 8.)  Plaintiff argues that the definite article "the" could be substituted for "said" without any change in meaning whatsoever. (*Id.*)  Plaintiff also argues that there is no interrelation between claims 15 and 48. (*Id.* at 9.)

Plaintiff further contends that the key word in the phrase "definitions of . . . outputs to be controlled" is "definitions." (*Id.* at 9-10.)  Plaintiff argues that the phrase means that the "definitions" control the output interfaces. (*Id.* at 10.)  Based on this premise, Plaintiff contends that there is no reason why the phrase "definitions of . . . inputs to be controlled" would be treated any differently. (*Id.*)  Plaintiff contends that it simply means that the definitions control the input interfaces. (*Id.*)  Plaintiff argues that when the input/output devices are the same devices, the I/O device has to be configured (controlled) to function as an input or an output. (*Id.*)

Plaintiff further argues that Defendant SkyBitz suggests that, but for the "to be controlled" language, things would be just fine, but with that language there is catastrophe. (*Id.*)  Plaintiff argues that Defendant SkyBitz fails to explain how any of this matters in light of the context. (*Id.*)  Plaintiff contends that if "inputs to be monitored" had been used instead of "inputs to be controlled," the claim would have said "comprising definitions of said one or more inputs [to be monitored]." (*Id.*)  According to Plaintiff, the phrase would still mean that the definitions in the database control the input interface. (*Id.*)  Plaintiff contends that both the inputs and the outputs are controlled by the definitions. (*Id.* at 11.)

Plaintiff also argues that Defendant SkyBitz contends that it is unclear how the inputs are to be controlled and even questions whether inputs can be controlled. (*Id.*)  According to

Plaintiff, the fact that inputs/outputs are configurable means that they can be controlled. (*Id.*) Plaintiff contends that the definition information in the database provides the control information that is implemented by the server and communicated wirelessly to the wireless communication units. (*Id.*) (citing '686 Patent at 4:48–51).   Plaintiff argues that the answer to Defendant SkyBitz's questions of what it is, where it comes from, and how it operates is addressed in the specification. (Dkt. No. 45 at 10) (quoting '686 Patent at 7:1–8).

Finally, regarding Defendant SkyBitz's written description argument, Plaintiff contends that it is improper and has no place in its claim construction brief. (*Id.* at 12.)   Plaintiff argues that Defendant SkyBitz is raising an enablement issue challenging invalidity, not a claim construction issue. (*Id.*)   Plaintiff contends that this type of defense should be raised in other proceedings. (*Id.*)   Plaintiff further argues that it has already pointed to the specification to show how the invention can be practiced in various embodiments, particularly with respect to the definitions in the database controlling the I/O devices. (*Id.*) (citing '686 Patent at 7:1–8).

For the following reasons, the Court finds that claims 15 and 48 do not contain an error that is evident from the face of the patent.  The Court further finds that the phrase **"said inputs to be controlled"** lacks antecedent basis in claims 15 and 48 and that the claims are **indefinite.**

### b)  Analysis

The phrase "said inputs to be controlled" appears in claims 15 and 48 of the '686 Patent. The Court finds that the phrase "said inputs to be controlled" lacks antecedent basis in claim 15 and 48.  Claim 15 does recite "inputs" in another claim element, but specifies that the "inputs . . . are operable for monitoring."  Likewise, claim 48 recites "inputs" in another claim element, but also specifies that the "inputs . . . operable for monitoring."  Thus, the claim is indefinite because it is unclear what the phrase "said inputs to be controlled" means in the context of the claims.

For example, it is unclear how selective port wiring inputs "operable for monitoring" are to be controlled.  It is also uncertain what the control of "said one or more inputs to be controlled" is, where it comes from, and how it operates.  In other words, a person of ordinary skill in the art is left without any guidance about: (a) who or what exerts the control over the inputs, (b) how the control is exerted, and (c) the extent of the control that is exerted over the inputs.

The Court further finds that the specification fails to provide any insight on how a wireless communication with configured selective port wiring "inputs" "operable for monitoring" are "to be controlled."  There is no reference to "inputs . . . operable for monitoring" being "inputs to be controlled" in the specification or claims of the '686 Patent as originally filed. (*Id.* at 23.)  Furthermore, the specification of the '686 Patent does not provide any explanation on how an input operable for monitoring can be controlled.  For example, it is unclear whether the inputs' directional connection (from target to unit) for monitoring somehow involves the outputs' directional connection (from unit to target) to be controlled.  In summary, the specification does not teach how "one or more inputs . . . operable for monitoring" can be "said one or more inputs to be controlled." (*Id.* at 25.)  Accordingly, the Court finds that Defendant SkyBitz and the ORBCOMM Defendants have met their burden and shown by clear and convincing evidence that the claims, when read in light of the intrinsic evidence, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

In this case, Plaintiff contends that claims 15 and 48 contain a typographical error and that the phrase "inputs to be controlled" should be construed to read "inputs to be monitored." (Dkt. No. 27 at 4.)  In *Novo Industries*, the Federal Circuit held that a district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different

interpretation of the claims. *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003).  Here, the Court finds that Plaintiff's arguments and action in this case indicate that the correction is subject to reasonable debate.  Indeed, in both this case and the 665 case, Plaintiff argues for an alternative construction of the phrase "input to be controlled." (*See, e.g.*, Dkt. No. 27 at 4 n.1.)  The Court does not find that the claims in this case include an obvious clerical error when Plaintiff continues to argue for an alternative construction.  Simply stated, in this case, the claims either include an obvious clerical error or they do not.  Plaintiff cannot have it both ways.

Moreover, Plaintiff had notice of this issue by at least June 5, 2015, when the Court held the claim construction hearing in the 665 case.  Yet, Plaintiff has not taken any steps to obtain a certificate of correction from the PTO in accordance with 35 U.S.C. § 254 or 255.  *See, e.g.*, *Group One, Ltd. v. Hallmark Cards, Inc.,* 407 F.3d 1297, 1302 (Fed. Cir. 2005) ("The alleged error involved here was correctable by the PTO. Section 254 provides for the correction of a PTO mistake with consequences set out in the statute as follows: 'Every such [corrected] patent, together with such certificate, shall have the same effect and operation in law on the trial of actions *for causes thereafter arising* as if the same had been originally issued in such corrected form.'") (quoting 35 U.S.C. § 254) (emphasis in original).  In fact, Plaintiff continues to propose an alternative construction in this case.  Thus, the Court finds that Plaintiff's actions and arguments show that the correction is subject to reasonable debate.  As a court in this district stated, "*Novo Industries* and *Essex* indicate that the 'no reasonable debate' standard is difficult to overcome." *STMicroelectronics, Inc. v. Motorola, Inc.*, 327 F. Supp. 2d 687, 702 (E.D. Tex. 2004) (Davis, J.).  Plaintiff's arguments and action remove any possibility of overcoming this standard in this case.

Plaintiff contends that the correction of an obvious clerical is an appropriate exercise of the Court's inherent authority. (Dkt. No. 27 at 4) (citing *Novo Indus. L.P. v. Micro Molds Corp.*, 350 F.3d 1348 (Fed Cir. 2003)).  Plaintiff argues that a plain reading of the '686 Patent, along with the prosecution history, make it evident that there is an obvious clerical error in claims 15 and 48. (Dkt. No. 27 at 4.)  The Court agrees that the examiner required that the '686 Patent claims recite the limitation that the "inputs/variables" were "to be monitored" and that the "outputs/items" were "to be controlled."  However, the Federal Circuit has held that "evidence of error in the prosecution history alone [is] insufficient to allow the district court to correct the error." *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1334 (Fed. Cir. 2014).  As the court stated in *H-W Tech,* the error has to be "evident from the face of the patent," and "[a]lthough other claims do contain the missing limitation, the inclusion of that limitation in one claim does not necessitate, or even fairly indicate, that the limitation should be included in all other claims." *H-W Tech.,* 758 F.3d at 1333.

Here, the Court finds that the error is not evident from the face of the patent.  If the error was evident from the face of the patent, then Plaintiff would not continue to argue for an alternative construction.  Instead, once identified, Plaintiff could have sought to correct the error with the PTO. *See, e.g., Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005) ("The district court found that the PTO was responsible for the error. Mr. Hoffer obtained a certificate of correction in accordance with 35 U.S.C. § 254 after this action was filed, changing the antecedent claim '38' to '21.'"); *Group One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1302 (Fed. Cir. 2005) ("While the error was that of the PTO, so far as the record reveals, Group One has failed to seek correction from the PTO.").

As Plaintiff's counsel stated during the claim construction hearing in this case, he didn't

think it was necessary or a requirement to seek correction from the PTO.  He further stated that there is support in the specification for inputs that are "controlled."  Given this, the Court finds that Plaintiff's arguments and actions in this case remove any possibility that the "no reasonable debate" standard has been overcome.  Moreover, the record indicates that Plaintiff has no intent to seek correction from the PTO.  Accordingly, the Court finds that it "does not have authority to correct the patent in such circumstances." *H-W Tech.*, 758 F.3d at 1334.

### c)  Court's Construction

In light of the evidence submitted by the parties, the Court finds that claims 15 and 48, when read in light of the intrinsic evidence, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.  Accordingly, the Court finds that claims 15 and 48 are invalid for failing to particularly point out and distinctly claim the subject matter regarded as the invention.

### 2.   "outputs for said wireless communication unit are operable to be controlled" and "outputs to be controlled"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "outputs for said wireless communication unit are operable to be controlled" | "signals provided from the wireless communication unit via a wired electrical connection that may be controlled" | "electrical signal outputs from the communications unit to the target that controls a desired action on the target" |
| "outputs to be controlled" | "signals provided from the wireless communication unit via a wired electrical connection that may be controlled" | "electrical signal outputs from the communications unit to the target that controls a desired action on the target" |

### a)  The Parties' Positions

The ORBCOMM Defendants argue that the disputed phrases should be construed as physical structures (not as signals) and that they must be outside of the wireless communication unit.  Defendant SkyBitz contends that Plaintiff's construction eliminates physical structure

recited in the claim language.  Plaintiff argues that the ORBCOMM Defendants' construction for the phrases is virtually identical to the construction proposed by Defendant SkyBitz in the 665 case.[3]  Plaintiff further contends that Defendants' construction adds limitation to the claims.

Turning to Plaintiff's construction, Plaintiff adopts the Court's vacated construction for these phrase from the 665 case.  Plaintiff contends that its construction has four elements: (1) signals; (2) from the communication unit; (3) via a wired electrical connection; (4) that may be controlled. (Dkt. No. 22 at 12.)  Plaintiff argues that the specification explicitly states that outputs are signals, and that the intrinsic evidence indicates that the recited "outputs" include signals. (*Id.*)  Plaintiff further argues that all parties have agreed that the outputs are "from the communication unit/monitoring unit." (*Id.*)  Plaintiff also contends that the term "output" expresses the idea of a signal in transit—a signal that is moving. (*Id.*)  Plaintiff further argues that an electrical signal that moves from one point to another has to be carried along some medium. (*Id.* at 12-13.)  Plaintiff contends that the connection is via a wired electrical connection. (*Id.* at 13.)

Plaintiff also argues that the outputs "may be controlled" language is a restatement of the claim language "operable to be controlled." (*Id.*)  Plaintiff contends that it is consistent with the intent of the patent as evidenced by the claims and the specification. (*Id.*)  Plaintiff argues that one of the features of the patented system is that the "outputs" may be configured to satisfy the user's needs and desires. (*Id.*)  Plaintiff contends that while these "outputs" may be controlled, the patent does not limit what they may control. (*Id.*)

Regarding the ORBCOMM Defendants' construction, Plaintiff argues that the

---

[3]  In view of Plaintiff's adoption of the Court's vacated construction for these phrases, the Court finds that Plaintiff's arguments for these phrases in the 665 case are withdrawn and considered MOOT. (Dkt. Nos. 39 and 45 in the 665 case.)

ORBCOMM Defendants import extraneous limitations that are not part of the claim term. (*Id.* at 13-14.)  Plaintiff contends that the ORBCOMM Defendants require that the outputs control some feature of the "target." (*Id.* at 14.)  Plaintiff argues that the ORBCOMM Defendants want to limit "outputs" to signals that lock and unlock the doors or enable and disable the engine. (*Id.*)  According to Plaintiff, "outputs" include those things, but are not limited to those things. (*Id.*)  Plaintiff contends that "outputs" may also give the user the option of controlling components in the monitoring unit as well as components on or near the target. (*Id.*)  Plaintiff argues that claim 51 explicitly describes "outputs" to turn on/off the GPS and "outputs" to reprogram the microcontroller. (*Id.*)  Plaintiff argues that "outputs" could also be used to control some device on or near the target. (*Id.*)

Plaintiff further contends that the ORBCOMM Defendants' construction is designed to reinsert limitations that require direct control of the target vehicle. (*Id.* at 15.)  Plaintiff argues that the ORBCOMM Defendants' construction imports a requirement of a "physical port" that directs electrical "signals to the target" and imposes the limitation that the signals "control a desired action on the target" (*Id.*)  Plaintiff contends that the output signals are not a physical port, much less one that directs signals to the target. (*Id.*)  Plaintiff argues that the '686 Patent identifies ports or interfaces when it intends to claim them as part of the recited structure. (*Id.*)

Plaintiff further argues that claim 51 explicitly claims "outputs" to control the microprocessor in the monitoring unit, *i.e.*, reprogramming the computer in the monitoring unit. (*Id.* at 16.)  Plaintiff contends that the "output" in claim 51 is not a signal to the target, but a signal from the monitoring unit to the microprocessor. (*Id.*)  Plaintiff argues that claim 51 also describes outputs to the GPS to turn it on and off for power conservation. (*Id.* at 17.)  Plaintiff contends that this is a signal from the monitoring unit to the GPS, which is a component in the

monitoring unit. (*Id.*)  Plaintiff further contends that the ORBCOMM Defendants' construction completely reads out these specifically claimed applications. (*Id.*)

Plaintiff further argues that the ORBCOMM Defendants define "outputs to be controlled" to require that the output "controls a desired action on the target." (*Id.*)  Plaintiff argues that this additional language is unwarranted and directly inconsistent with the patent's claims. (*Id.*) Plaintiff contends that claim 51 specifically identifies the power to the GPS as one of the outputs to be controlled, which is not "a desired action on the target." (*Id.* at 17)

Regarding Defendant SkyBitz's construction, Plaintiff argues it is too restrictive. ((Dkt. No. 39 at 29 in the 665 case).   Plaintiff contends that the outputs are signals from the communication unit, but they do not necessarily control an action on the target. (*Id.*)  Plaintiff argues that the outputs can potentially control a whole host of things, and the specification explains that the invention is intended to allow virtually unlimited versatility. (*Id.*) (citing '686 Patent at 7:45–49).

Plaintiff further argues that Defendant SkyBitz's construction is inconsistent with claim 51.  According to Plaintiff, claim 51 specifically identifies the power to the GPS as one of the outputs to be controlled, which is not "a desired action on the target." (Dkt. No. 39 at 30.) Plaintiff also argues that claim 51 contemplates sending outputs to control the microprocessor in the monitoring unit, *i.e.*, reprogramming the computer on the monitoring unit. (*Id.*)

The ORBCOMM Defendants respond that the claim language, specification, prosecution history, and the agreed construction of other terms demonstrate that the term "output" should be understood as a structural component, not a signal. (Dkt. No. 25 at 19.)   The ORBCOMM Defendants argue that the claim language indicates that the "outputs" are related to and connected with the "selectable port wiring interface," which is unquestionably a physical

element of the claim. (*Id.* at 20.) The ORBCOMM Defendants contend that to the extent that the outputs are connected to the wiring interface, they are necessarily physical elements of the claim, not signal based elements. (*Id.*) The ORBCOMM Defendants argue that a signal cannot be "connected" to a physical structure because a signal necessarily travels between two points. (*Id.*)

The ORBCOMM Defendants further argue that the figures of the '686 Patent consistently show the "outputs" as physical elements. (*Id.*) (citing '686 Patent at Fig. 1). The ORBCOMM Defendants also argue that the description of Figure 1 groups inputs and outputs and describes physical devices that are connected to the device. (Dkt. No. 25 at 21) (citing '686 Patent at 6:60–63). The ORBCOMM Defendants further argue that the specification similarly refers to the outputs as physical parts of the target. (Dkt. No. 25 at 21) (citing '686 Patent at 10:31–35). The ORBCOMM Defendants also contend that the '686 Patent refers to "activating" an output. (Dkt. No. 25 at 21) (citing '686 Patent at 11:39–45). According to the ORBCOMM Defendants, if the inventor intended to use "output" to refer to a signal, the obvious phrasing would be that the system would "send" an output. (Dkt. No. 25 at 21.) The ORBCOMM Defendants argue that the use of the word "activate" indicates an intent to use the term "output" to refer to a physical component. (*Id.*)

The ORBCOMM Defendants also contend that "outputs" are effects on physical things. (*Id.*) (citing '686 Patent at 7:46–49). The ORBCOMM Defendants argue that electrical signals are used to cause the effect on the output, but the primary aspect of the term "output" is the physical device that is affected, not the electrical signal that caused the effect. (Dkt. No. 25 at 22.) The ORBCOMM Defendants further argue that the patentees distinguished one piece of prior art by noting that it does not "involve ports or wiring of inputs and outputs to the ports." (*Id.*). According to the ORBCOMM Defendants, this statement can be understood only if the

term output is construed as a structural component. (*Id.*)

The ORBCOMM Defendants further contend that the specification demonstrates that the "outputs" refer to connections that are external to the wireless communications unit. (*Id.* at 23.) The ORBCOMM Defendants argue that the plain meaning of the term "output" cannot include entirely internal communications or physical structures over which such communications travel. (*Id.*)   The ORBCOMM Defendants also contend that construing the term "output" to include entirely internal structures or communications would be contrary to any reasonable understanding of that term. (*Id.*)    The ORBCOMM Defendants argue that internal communications are not "outputs" under any reasonable understanding of the word. (*Id.* at 24.) The ORBCOMM Defendants also argue that Plaintiff does not explain how internal communications could qualify as signals "from" the unit. (*Id.*)

The ORBCOMM Defendants further argue that the patent's description of the "outputs" expressly states that they are links to the target. (*Id.*) (citing '686 Patent at 2:24–26).   The ORBCOMM Defendants also argue that the written description consistently provides examples of outputs that are actions on the target. (Dkt. No. 25 at 24) (citing '686 Patent at 7:46–49, 10:31–35).  The ORBCOMM Defendants contend that the figures show outputs as being used to connect the wireless communication unit with devices that are outside of the device. (Dkt. No. 25 at 25.)  The ORBCOMM Defendants argue that Figure 1 demonstrates that the outputs are a means for connecting the wireless communication unit with the target or with devices that are external to the system. (*Id.* at 26.)   The ORBCOMM Defendants also contend that Figure 5 shows the "I/O PORT" as connecting to "OUTPUTS" and "INPUTS" that are separate from the internal aspects of the wireless communications unit. (*Id.*)

The ORBCOMM Defendants also argue that the written description does not disclose the

GPS device being connected via the inputs or outputs. (*Id.*)  According to the ORBCOMM Defendants, the written description indicates that the GPS device, which is internal to the unit, is connected by another means. (*Id.*) (citing '686 Patent at 11:36–45).  The ORBCOMM Defendants argue that the written description makes no mention of using an "output" to poll the GPS. (Dkt. No. 25 at 27.)  The ORBCOMM Defendants argue that this omission is telling because the very next sentence expressly discusses the use of an "output" to control the door locks on the target. (*Id.*)  The ORBCOMM Defendants further contend Plaintiff does not cite to a single reference in the specification to support its contention that the "outputs" can be used to connect the central processor to other internal aspects of the wireless communication unit. (*Id.*)

The ORBCOMM Defendants further argue that the only evidence that Plaintiff relies upon to support its proposed construction is claim 51. (*Id.*)  The ORBCOMM Defendants contend that Plaintiff may not properly rely upon a claim added in reexamination if it cannot cite to support for the construction in the original specification. (*Id.*)  The ORBCOMM Defendants argue that doing so would improperly allow a patentee to use the reexamination process to broaden the patent's claims. (*Id.*) (citing *Total Containment, Inc. v. Environ Products, Inc.*, 106 F.3d 427 (Fed. Cir. 1997)).  The ORBCOMM Defendants argue that Plaintiff seeks to broaden the construction of the term "output" to include connections that are wholly internal to the wireless communication unit based solely upon a claim it added during reexamination. (Dkt. No. 25 at 28.)  The ORBCOMM Defendants argue that Plaintiff must cite to material that was in the original application to support its contention. (*Id.*)  The ORBCOMM Defendants contend that Plaintiff did not cite to anything in the original written description to support the conclusion that "outputs" are connections that are entirely internal to the communication unit. (*Id.*)

Defendant SkyBitz argues that Plaintiff proposes to substitute "signals or data" for the

structural claim element "outputs" referenced in the "introductory" clause. (Dkt. No. 44 at 28 in the 665 case.)  Defendant SkyBitz contends that this is counter to the claim language, disregards the basis upon which the patentee defined over the Reexamination Suman reference, and obliterates the Examiner's Reasons for Allowance of the *Ex Parte* Reexamination Certificate. (*Id.*)

Defendant SkyBitz further contends that the correct construction recognizes that the configured port wired outputs are structural wired connections from the communications unit to the target. (*Id.*)  Defendant Skybitz argues that its construction uses an adjectival modifier "electrical signal" to the noun "outputs" as an explanatory statement of the type of structural outputs positively recited in the subject claims. (*Id.*)  Defendant Skybitz also argues that the output "controls a desired action on the target." (*Id.*)  Defendant Skybitz contends that this is supported by the specification, captures the selectively wired output line direction of the claim language at issue, and is consistent with the reexamination history. (*Id.* at 28-29) (citing Dkt. 44-4 at 7-8 in the 665 case (Oct. 20, 2010 Office Action Response), Dkt. 44-3 at 10-11 in the 665 case (Dec. 13, 2010 Notice of Intent to Issue *Ex Parte* Reexamination Certificate)).

Plaintiff replies that all of the Defendants, including the ORBCOMM Defendants, have agreed that "inputs" should be construed as "signals to the communication units." (Dkt. No. 27 at 14.)  Plaintiff argues that if "inputs" are construed as "signals to the communication unit," the term "outputs" must be construed in a consistent manner to mean "signals from the communication unit." (*Id.*)  Plaintiff contends that the intrinsic evidence supports the parties' agreed construction of "inputs" and Plaintiff's proposed construction of "outputs." (*Id.*) (citing '686 Patent at Abstract, 9:53–56, 2:24–29).  Plaintiff also argues that the description of Figure 1 shows that inputs, outputs, and status signals are "signals," not ports. (Dkt. No. 27 at 15.)

Plaintiff contends that the physical structure, such as the "digital I/O", "interface", "monitoring device," and "sensors" are described elsewhere. (*Id.*)  According to Plaintiff, if the ORBCOMM Defendants' construction was correct, there would be no reason to describe and discuss the "interface" and "cabling." (*Id.*)

Plaintiff further contends that in the Notice of Allowance, the examiner repeatedly distinguished between "ports," "inputs," and "outputs," which confirms that "inputs" and "outputs" are signals to/from the communication unit and not "physical ports." (*Id.*) (citing Dkt. No. 27-1 at 5-6).  Plaintiff further argues that the Notice of Allowance also distinguished the Suman reference by noting that Suman fails to teach the limitations noted in the reasons for allowance, including "a common database, located at the 'network server' that stores, for the one or more 'monitoring devices' and each monitoring device's related 'targets' the selectively variable configurations defining the ports, inputs, and outputs in combination along with the other limitations of the independent claims." (Dkt. No. 27 at 15) (citing Dkt. No. 27-1 at 23).

Plaintiff further argues that claim 51 explicitly describes "outputs" to turn on/off the GPS and "outputs" to reprogram the microcontroller. (Dkt. No. 27 at 16.)  Plaintiff also argues that claim 51 describes that "outputs" can be used to set a flag in the memory device of the communication/monitoring unit. (*Id.*)  Plaintiff contends that "outputs" may give the user the option of controlling components in the monitoring unit as well as components on or near the target. (*Id.*)  Plaintiff argues that the ORBCOMM Defendants' contention that "outputs" must be "external to the wireless communications unit" is found nowhere in the specification or prosecution history. (*Id.*)

Plaintiff further argues that the specification provides specific support for Claim 51. (*Id.*)  Plaintiff argues that the specification states that the "monitoring device 10 may be programmed

to control power itself as discussed subsequently so as to further reduce power usage." (*Id.* at 16-17) (citing '686 Patent at 6:29–31).   Plaintiff further argues that the specification specifically references that the monitoring system can program and control the power to the GPS. (Dkt. No. 27 at 17) (citing '686 Patent at 9:63–10:4).   Plaintiff further argues that the specification supports claim 51's reference to setting a flag in a memory to be operated on by a microcontroller and controlling the microcontroller to send location information. (Dkt. No. 27 at 17) ('686 Patent at 10:58–67, 11:25–27; and 11:31–41).

For the following reasons, the Court finds that the phrase **"outputs for said wireless communication unit are operable to be controlled"** should be construed to mean **"signals provided from the wireless communication unit via a wired electrical connection that may be controlled."**   The Court also finds that the phrase **"outputs to be controlled"** should be construed to mean **"signals provided from the wireless communication unit via a wired electrical connection that may be controlled."**

### b)  Analysis

The phrase "outputs for said wireless communication unit are operable to be controlled" appears in claims 15 and 48 of the '686 Patent.   The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim.   The phrase "outputs to be controlled" appears in claims 15, 29, and 48 of the '686 Patent.   The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim.   The parties agree that both phrases should be construed the same.

The Court finds that the intrinsic evidence indicates that the recited "outputs" include signals.   The specification states that "[t]he outputs and inputs are electrical signals that are used with the target and are related to the type of target and may include a wide range of signals."

'686 Patent at 9:53–56.  The specification further states that "[a] plurality of inputs to the monitoring device from the target are provided as well as plurality of outputs from the monitoring device to the target. If the target is a vehicle, then the interface communicates electrical signals relating to one or more elements of the vehicle." *Id.* at 2:24–29.  Furthermore, the parties agree that "outputs" include or direct electrical signals.   Defendant SkyBitz's construction includes "electrical signal outputs," and the ORBCOMM Defendants' construction includes directing "electrical signals."   The parties also agree that "outputs" are from the wireless communication unit.  The Court finds that this is indicated by the claim language, which recites "outputs for said wireless communication unit."   Accordingly, the Court finds that "outputs" are "signals provided from the wireless communication unit."

The parties dispute whether the recited "outputs" include not only a signal, but also physical structure (*i.e.*, an electrical connection or a physical port).  The Court finds that the intrinsic evidence indicates that the recited "outputs" include a wired electrical connection.  Specifically, during the reexamination, the patent owner repeatedly emphasized that the prior art failed to disclose inputs and outputs that are wired and connected to ports.  The patent owner argued that "[c]learly, Suman does not teach the capability to select which inputs and outputs can be connected to which ports . . . as required by the claim language." (Dkt. No. 44-4 at 20 in the 665 case (Oct. 20, 2010 Office Action Response)).  Similarly, the patent owner argued that "Wooten does not teach configurable ports which are selectively connected to the inputs and outputs." (*Id.*)

The patent owner also argued that the input and outputs include a wired electrical connection by arguing that "[t]he proposed citation from Suman (43:64-44:16) … for 'installing' inputs and outputs to the monitoring device clearly are not operable for selective wiring for the

ports, inputs, and outputs, and do not involve wiring at all." (*Id.* at 31, *see also*, *id.* at 19 ("The proposed citation from Suman (43:64-44: 16) by Requestor and the Office Action for 'installing' inputs and outputs to the monitoring device clearly are not operable for selective wiring and do not even involve ports or wiring of inputs and outputs to the ports.").

Consistent with the patent owner's arguments, the examiner's reason for allowance stated that "[t]he 'configurable interface' ('686 Patent, 7: 1-13; 10: 20-36) between each monitoring device and each monitoring device's associated target comprises ports that are selectable for connection to individually selectable inputs (inputs to monitoring device from target) and individually selectable outputs (outputs from monitoring device to control target)." (Dkt. No. 44-3 at 5 in the 665 case, Dec. 13, 2010 Notice of Intent to Issue *Ex Parte* Reexamination Certificate)).  Furthermore, consistent with the prosecution history, the claim language itself indicates that the "outputs" include a wired electrical connection.  Claims 15 and 48 recite that the "wiring interface" is for "selective wiring" of the targets to the wiring interface.

The specification also indicates that the recited "outputs" include a wired electrical connection.  The specification states that "[m]onitoring device 10 may be used to produce outputs such as door locks, ignition kill, to produce an audible alarm for the driver, or to effect any other feature that can be electrically interfaced to monitoring device 10." '686 Patent at 7:46–49.  The specification further states that "[i]nitialization essentially requires notifying system 100 what each port is connected to . . . the outputs are listed, e.g., output line one to alarm, output line two to door locks, output line three to an engine kill, etc. In this way, system 100 and/or the client can operate each of these items remotely" *Id.* at 10:21–36.  An output line that is connected to the wireless communication unit is not purely a signal, but requires a wired electrical connection.  Accordingly, the Court finds that the recited "outputs" include signals

provided from the wireless communication unit via a wired electrical connection.  To the extent that Plaintiff contends that the "outputs" can be purely signals or data, the Court rejects this argument.  The outputs require a "wired electrical connection."

The claim language further indicates that the "outputs" may be controlled by client computers.  For example, claims 15 and 48 recite that the outputs are "operable to be controlled by said respective of said plurality of client computers."   Similarly, claim 29 recites that the outputs are "to be controlled."   In this regard, the specification states that "system 100 can remotely control the outputs," thereby allowing a client "who may be in another country" to "effect a desired output through monitoring device 10." '686 Patent at 7:55–59.  As an example, the specification states that "system 100 might send a message that has the effect of unlocking the doors of a vehicle." *Id.* at 11:40–41.  Accordingly, consistent with the language recited in the construed phrase, the Court finds that the recited "outputs" may be controlled.

Turning to the parties' arguments, the ORBCOMM Defendants contend that the "outputs" should be construed as a physical port that is connected to something outside the wireless communication unit.  The Court disagrees that "outputs" should be construed as a physical port.  The specification explicitly states that "[t]he outputs and inputs are electrical signals that are used with the target and are related to the type of target and may include a wide range of signals." '686 Patent at 9:53-56.  Consistent with this statement, the parties' agreed that the terms "inputs to be monitored" and "inputs . . . operable to be monitored" should be construed to mean "signals provided to the wireless communication unit via a wired electrical connection that may be monitored."  Like "inputs," "outputs" include "signals provided . . . via a wired electrical connection."  Accordingly, the Court finds that the terms "output" and "inputs" should be construed consistent with one another.  Indeed, the specification states that "[a]

plurality of inputs to the monitoring device from the target are provided as well as plurality of outputs from the monitoring device to the target. If the target is a vehicle, then the interface communicates electrical signals relating to one or more elements of the vehicle." '686 Patent at 2:24–29.  Again, this indicates that the inputs and outputs include signals.

Moreover, the claims indicate that when the patentees intended to claim "ports," they did so explicitly.  For example, claim 1 recites "a configurable interface between said monitoring device and said target for communicating signals relating to said target comprising a plurality of ports."  Likewise, claim 3 recites "providing a configurable electrical interface with a plurality of ports."  Claim 15 recites "said plurality of wireless communication units each comprising a selectable port wiring interface for selective wiring of each of said plurality of wireless communication units to said plurality of targets."  Finally, claim 48 recites "said plurality of wireless communication units each comprising a selectable port wiring interface for selective wiring of each of said plurality of wireless communication units to said plurality of targets."  As indicated by this claim language, when the patentees intended to claim "ports," they did so explicitly.  Indeed, if the ORBCOMM Defendants' construction was inserted into the claims, the proposed "physical port" would conflict with other elements of the claims where the term "port" is recited.

The ORBCOMM Defendants also argue that the specification indicates that "outputs" are physical elements. (Dkt. No. 25 at 20) (citing '686 Patent at claim 48, 6:60–63, 10:31–35, 11:39–45, 7:46–49).  According to the ORBCOMM Defendants, a signal cannot be "connected" to a physical structure because a signal necessarily travels between two points. (Dkt. No. 25 at 20.)  To be clear, the Court is not construing "output" as only an electrical signal, as the ORBCOMM Defendants suggest.  Instead, the Court's construction is "signals provided from the

wireless communication unit via a wired electrical connection."  To the extent that a party contends that the "outputs" must be either a signal or a physical structure, the Court rejects this argument.

The ORBCOMM Defendants also contend that the "outputs" refer to connections that are external to the wireless communications unit. (Dkt. No. 25 at 23.)  The Court agrees that the specification provides examples where the outputs are external to the wireless communications unit. *See, e.g.*, '686 Patent at 2:24–26 ("A plurality of inputs to the monitoring device from the target are provided as well as plurality of outputs from the monitoring device to the target."), 7:46–49 ("Monitoring device may be used to produce outputs such as door locks, ignition kill, to produce an audible alarm for the driver, or to effect any other feature that can be electrically interfaced to monitoring device."), 10:31–35 ("Likewise the outputs are listed, e.g., output line one to alarm, output line two to door locks, output line three to engine kill, etc. In this way, system and/or the client can operate each of these items remotely.").

However, the claims are not limited to these embodiments, and the specification also indicates that "outputs" refer to connections that are internal to the wireless communications unit.  For example, the specification indicates that the wireless communication unit includes a global position sensor, a microcontroller, and a memory. *See, e.g.*, '686 Patent at 9:60–10:19. Independent claim 48 explicitly recites that the wireless communication units include a global position sensor, and that "one or more outputs for said wireless communication unit are operable to be controlled."  Dependent claim 51 further recites that "the outputs to be controlled comprise a power control for said global position sensor, setting a flag in a memory to be operated on by a microcontroller, and controlling said microcontroller to send said location information."  In other words, the claim language indicates that the recited "outputs" can power the GPS, can program

the microcontroller, and can set a flag in the memory device of the communication/monitoring unit.

The ORBCOMM Defendants argue that because claim 51 was added during the reexamination, it cannot serve as the basis for broadening the term "output" from its natural meaning as connections that are "outside" the device. (Dkt. No. 25 at 28) (citing *Total Containment v. Environ Prods.*, 1997 U.S. App. LEXIS 793, *4-5 (Fed. Cir. Jan. 17, 1997)). In *Total Containment*, the Federal Circuit stated that the patent owner could not "invoke the doctrine of claim differentiation by relying on a claim added during reexamination to interpret language in one of the original claims in a way that would broaden the reach of that claim." *Total Containment*, 1997 U.S. App. LEXIS 793, at *5. The facts in this case are distinguishable from *Total Containment* because the limitation in question, the recited "output," was added during reexamination to all of the independent claims at the same time dependent claim 51 was added. Moreover, independent claim 48, the claim from which claim 51 dependents, was added in its entirety during the reexamination. Therefore, this is not a case where the patentee is attempting to broaden original claims. Instead, the claims were narrowed during reexamination, and claim 51 provides an indication of the scope of the narrowing amendments.

Moreover, the specification provides specific support for claim 51. For example, the specification states that the "monitoring device 10 may be programmed to control power itself as discussed subsequently so as to further reduce power usage." '686 Patent at 6:29–31. The specification also specifically references that the monitoring system can program and control the power to the GPS as follows:

> GPS [56] communicates with microcontroller/CPU [50] and provides location information whenever requested. To save power, microcontroller can place GPS [56] in an idle position by means of GPS power control [58] until a GPS signal is requested by microcontroller [50], which in turn may have been requested from

system [100] through pager/modem/pager port [52]. Power control may be effected by a mosfet or other switching device as desired for low cost and reliable operation.

'686 Patent at 9:63–10:4. The specification further describes "setting a flag in a memory to be operated on by a microcontroller and controlling the microcontroller to send location information" as follows:

> [A] flag may be set that determine whether or not to save the location data and may typically be set in response to a signal from system [100]. The location data may be logged if desired into memory such as memory [55] if it is desired to save a series of location data. While system [100] can effect logging on any time schedule or in response to events that may occur with respect to inputs, monitoring unit 10 may also be programmed to log data into memory [55] such as events, location data, output signals, and the like.
>
> Assuming the initialization flag is set, then microcontroller [50] checks to see if flags are set for new messages from system [100], and if so, then the messages are downloaded as indicated at [78].
>
> If there is a message from the system [100], then it is downloaded and the message is deleted from the list or queue of messages if there is more than one message waiting. Assuming the message makes a valid request or one that is line with the initialization criteria as indicated [84], then the message is executed at [86]. An example might be a message from the system [100] to send location data. In that case, at this time microcontroller would proceed according to programming to poll GPS [56] to obtain an update of the location. As another example, system [100] might send a message that has the effect of unlocking the doors of a vehicle.

'686 Patent at 10:58–67, 11:25–27, and 11:31–41. Accordingly, the Court finds that claim 51 does not broaden the scope of the original claims and is fully supported by the specification.

In addition, the Court is not persuaded that the construction should specify that the outputs must be from the communication unit "to the target." Claim 15 recites that wiring interface is used to wire the "wireless communication units to said plurality of targets." This is not necessarily the same as requiring the outputs to be from the communication unit "to the target." The specification further states that "[m]onitoring device 10 may be used to produce outputs such as door locks, ignition kill, to produce an audible alarm for the driver, or to effect

any other feature that can be electrically interfaced to monitoring device 10." '686 Patent at 7:46–49.  Thus, to the extent that a parties' construction would exclude a feature used with a vehicle, the Court rejects this construction.

Regarding Defendant's requirement that the output "control[s] a desired action on the target," the Court finds that this language is unwarranted.  Defendant SkyBitz contends that this language is supported by the specification and captures the selectively wired output line direction of the claim language at issue. (Dkt. No. 44 at 28 in the 665 case.)  The Court is not persuaded by Defendant SkyBitz's argument.  As Plaintiff contends, the intrinsic evidence indicates that the outputs are signals from the communication unit, but they do not necessarily control an action on the target.  As discussed above, claim 51 states that the "one or more outputs to be controlled comprise a power control for said global position sensor, setting a flag in a memory to be operated on by a microcontroller, and controlling said microcontroller to send said location information."  Here the claim specifically identifies the power to the GPS as one of the outputs to be controlled.  To the extent that Defendants argue that controlling the power to the GPS would not control a desired action on the target, the Court rejects this argument.  However, as discussed above, the recited outputs are signals provided from the wireless communication unit via a wired electrical connection.  Furthermore, the Court has found that the "selectable port wiring interface" provides at least one selected electrical connection as part of the wireless communication unit.

### c)  Court's Construction

In light of the intrinsic and extrinsic evidence, the Court construes the phrase **"outputs for said wireless communication unit are operable to be controlled"** to mean **"signals provided from the wireless communication unit via a wired electrical connection that may be controlled;"** and the phrase **"outputs to be controlled"** to mean **"signals provided from the**

wireless communication unit via a wired electrical connection that may be controlled."

## I.      CONCLUSION

The Court adopts the above constructions.  The parties are ORDERED that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ORDERED to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

Within thirty (30) days of the issuance of this Memorandum Opinion and Order, the parties are hereby ORDERED, in good faith, to mediate this case with the mediator agreed upon by the parties. As a part of such mediation, each party shall appear by counsel and by at least one corporate officer possessing sufficient authority and control to unilaterally make binding decisions for the corporation adequate to address any good faith offer or counteroffer of settlement that might arise during such mediation. Failure to do so shall be deemed by the Court as a failure to mediate in good faith and may subject that party to such sanctions as the Court deems appropriate.

**So ORDERED and SIGNED this 10th day of September, 2015.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE